In re Wayne W. CONN, Marquerite L. Conn, Debtors.

ASSOCIATES FINANCE, Plaintiff,

v.

Wayne W. CONN, Marquerite L. Conn, Defendants.

**Bankruptcy No. 3801366.**

United States Bankruptcy Court, W. D. Kentucky.

Jan. 19, 1982.

As Amended Jan. 26, 1982.

William R. Mapother, Louisville, Ky., for plaintiff.

James F. Collins, III, Louisville, Ky., for debtors.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Bankruptcy Judge.

In a case of first impression, we must decide whether the purchase money nature of a lien survives a subsequent refinancing of the same loan by the same creditor. The question is crucial in bankruptcy because if the purchase money character of the obligation is lost upon refinancing, the lien may be avoided by the debtor. On the other hand, if the purchase money nature of the security interest survives a future refinancing, then the creditor may exercise its traditional remedies against the secured property. Courts have uniformly held that the purchase money nature of such liens is extinguished by refinancing. We hold to the contrary.

\* \* \*

Associates Finance objects to the debtors' motion to avoid as a non-purchase money lien its security interest in a 25″ color television console. The heart of the issue is whether Associate's security interest is purchase money or non-purchase money.

On January 24, 1978, the debtors purchased a color television set from the assignor of Associates. At that time, the debtors executed a retail installment contract and the seller retained a purchase money security interest in the television. A week later, the seller assigned the contract to Associates Finance.

On December 7, 1979, the debtors refinanced the obligation for the television by executing with Associates a note for $1,045.13. At the time of the refinancing, the outstanding balance on the first note was $342.39. That balance was paid, the first note was cancelled, and the debtor was given approximately $700 in new money. Associates took as security for the second note the television set, along with numerous household goods.

The debtors now seek to avoid the lien on the television on the ground that the purchase money character of Associates' security interest was lost upon refinancing.

\* \* \*

The problem of the survivability of a purchase money security interest through multiple financing arrangements has surfaced principally in the bankruptcy context.

In the typical case, either a seller or a lender retains or acquires a security interest in newly purchased property. When the same creditor makes subsequent advances, those advances are also secured by that property. Because the contract under which the security interest is taken seldom provides for any order of payment, the property continues to secure later advances

and the security interest in it is not released until the entire accumulated debt is paid.

Pre-Bankruptcy Code cases have consistently denied purchase money status to security interests perpetuated by the type of financing arrangements described above.[1] The consequence in those cases was the subordination of the creditor's security interest, unperfected for lack of proper filing, to the interest of the bankruptcy trustee.

Although Section 522(f) of the Bankruptcy Code has shifted the importance of purchase money status from perfection to lien avoidance, courts continue to hold that a purchase money security interest does not survive if collateral secures subsequent advances as well as its own price.[2]

■ The issue of the survival of a purchase money security interest is one especially suited for resolution by reference to state law.[3] Although the debtors maladroitly argue that state law should not be considered because lien avoidance is governed solely by bankruptcy law, the precondition of lien avoidance, nonpurchase money status, derives from state statute. State courts, however, have seldom addressed the issue.[4]

The only state law reference we can make is to Section 9–107 of the Uniform Commercial Code.[5]

A security interest is a "purchase money security interest" to the extent that it is:

(a) taken or retained by the seller of the collateral to secure all or part of its price; or

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

The second paragraph of the Official Comment to Section 9–107 elaborates: "[T]he quoted language excludes from the purchase money category any security interest taken as security for or in satisfaction of a pre-existing claim or antecedent debt".

The seminal case interpreting § 9–107 and its comment as they relate to the question of purchase money survival is *In re Simpson*,[6] a bankruptcy case decided shortly after widespread enactment of the Uniform Commercial Code. Although *Simpson's* resolution of the issue was only dicta,[7] courts have nonetheless relied heavily upon it.

*Simpson* invalidated a purchase money security interest because of the presence of a future advances clause in the contract. Citing Comment Two of § 9–107, the court found "no distinction between the pre-existing claim or antecedent debt on the one hand and future advances on the other insofar as such provisions in a security agreement may disqualify a security interest

1. *In re Manuel*, 507 F.2d 990 (5th Cir. 1975); *In re Norrell*, 426 F.Supp. 435 (M.D.Ga.1977); *In re Johnson*, 1 BCD 1023 (S.D.Ala.1975); *In re Jackson*, 9 UCC Reporting Service 1152 (W.D. Mo., Ref. 1971); *In re Brouse*, 6 UCC Rep. 471 (W.D.Mich., Ref. 1969); *In re Simpson*, 4 UCC Rep. 243 (W.D.Mich., Ref. 1967); but cf. *In re Staley*, 426 F.Supp. 437 (M.D.Ga.1977), where purchase money status was preserved upon refinance because agreement provided that security interest in first purchased item was to terminate as soon as its purchase price was paid, and thus property did not secure more than its price.

2. *In re Jones*, 6 BCD 848, 5 B.R. 655 (Bkrtcy.M. D.N.C.1980); *In re Scott*, 6 BCD 407, 5 B.R. 37, 2 CBC 2d 1012 (Bkrtcy.M.D.Pa.1980); *In re Mulcahy*, 6 BCD 223, 3 B.R. 454 (Bkrtcy.S.D. Ind.1980).

3. See, e.g. *Lewis v. Manufacturers National Bank of Detroit*, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961).

4. The single state court case addressing the issue is out of Pennsylvania. The Court in a single paragraph, citing no authority, found that a second financing that did not supply additional funds to the debtor did not extinguish a purchase money security interest, *Union Nat'l. Bank of Pittsburgh v. Northwest Marine, Inc.*, 27 UCC Rep. 563 (Pa.Ct.Comm.Pl. 1979).

5. KRS 355.9–107.

6. Supra note 1.

7. Although the Court denied purchase money status, it ultimately found that the secured creditor perfected its security interest in the collateral by taking possession of it.

from being a 'purchase money security interest'." [8]

The *Simpson* court concluded that because the future advances clause resulted in the collateral securing more than its price, no purchase money security interest had been created. Purchase money protection, the court held, extends when the collateral secures only its own price, and nothing more.

Aside from some minor criticism of *Simpson's* application of Official Comment Two to Subsection (a) of 9–107,[9] the *Simpson* holding has gone unchallenged.

■ There is, however, a fundamental error in *Simpson's* interpretation of Section 9–107. Section 9–107 confers purchase money status "to the extent that" the security interest is retained by the seller or taken by one making advances. An item may thus secure both its price and other debt as well, though a security interest is purchase money only as to that part of the debt representing the item's unpaid price. Contrary to the *Simpson* court's conclusion, a purchase money security interest is not invalidated entirely merely because an item secures more than its price.[10]

The court in *Simpson* anticipated criticism of its reasoning, but did not persuasively address it:

It could be argued that a literal reading of § 9–107, supra, would not invalidate a nonfiled purchase money security interest "to the extent that it is taken and retained by the seller . . . to secure all or part of its price" even though it also secured future advances. But the Comments of the Commissioners indicate that such a literal reading was not intended (Official Code Comment No. 2).[11]

We do not read the Code Comment as substantially altering the lucid message of Section 9–107.. We are especially hard pressed to find in the Comment any indication that Section 9–107 is not to be read literally. Comment Two to 9–107 prohibits the taking of purchase money security interests in antecedent debts, and could likewise apply to future advances, but it does not demand that purchase money status be denied in its entirety because an item secures both its own price and antecedent debts or future advances.

Courts that have relied on *Simpson* have generally employed the same faulty application of Section 9–107. Those courts have consistently denied purchase money status when collateral secures, along with its own price, antecedent debts or future advances.[12] One notable exception is *In re Coomer*,[13] in which the court acknowledged that cases deciding this issue have often ignored that Section 9–107 confers a purchase money security interest in collateral *to the extent* it secures its price, even if future advances are also covered.

*Coomer* observed, however, that in those cases that misinterpreted Section 9–107, the overriding concern was the absence of a method, or formula, for determining what portion of the debt was purchase money. Reiterating that concern, the *Coomer* court followed prevailing case law and conditioned purchase money status on the presence of an apportionment method. *Coomer* refused to strictly apply the Section 9–107 definition of a purchase money security interest for fear it would not properly reflect the underlying policy of § 522(f) of the Code.. It held that if a refinancing creditor does not provide an apportionment method, its security interest is non-purchase money;

**8.** Supra note 1, at 246.

**9.** *In re Mid-Atlantic Flange Co., Inc.*, 5 BCD 693, 695 (E.D.Pa.1979), where the court pointed out that Comment Two applies only to 9–107(b), and thus only to lenders, not sellers.

**10.** Willier & Hart, *U.C.C. Reporter Digest*, § 9–107, A16, Comment at 2–1620.8 (Matthew Bender & Co.).

**11.** Supra note 1, at 247.

**12.** See e.g. cases cited at footnotes 1 and 2, supra.

**13.** 8 B.R. 351 (Bkrtcy.E.D.Tenn.1980).

if it does, its security interest is purchase money.[14]

*Coomer* thus falls in line with those cases holding that purchase money status obtains only when there is a method, statutory [15] or contractual,[16] for confining the security interest to the collateral's price.

We see no distinction between cases in which a debt is statutorily or contractually apportioned, and cases in which there is no apportionment method, so great that purchase money status should hinge on it. A contract provision or statute may make easier the job of determining how payment is to be applied toward the purchase money debt; but neither is necessary to give effect to the rule that a security interest is purchase money to the *extent* that property secures its price.

Courts making that distinction, however, tend to assume that without an established apportionment method, the process for determining the extent to which a security interest is purchase money would be so complicated that it would render application of the rule of § 9–107 impossible. *Coomer*, for instance, noted that "without some guidelines, legislative or contractual, the court should not be required to distill from a mass of transactions the extent to which a security interest is purchase money".[17]

Even with such guidelines, however, determining the extent of a purchase money security interest may be no simple task. *In re Brouse* [18] upheld as purchase money a security interest taken after Michigan enacted its Retail Installment Sales Act. That Act provided that payments on a revolving charge or "add-on" account be allo-

cated to each secured item in the same ratio as the item's purchase price bears to the total of the prices of all other items. Under that method each item would remain purchase money secured to some extent until the entire balance was paid. The difficulty in applying that method is in trying to ferret out what has been paid on a specific item and what remains to be paid. The Court correctly observed "that the mathematical calculations to determine the amount due and owing on any one item will be complex . . .",[19] but it nonetheless granted purchase money status solely because the Michigan Act provided an apportionment method, albeit a complicated one.

What some courts have concluded can be accomplished only by contract or statute, despite the complications that might obtain, can just as easily be accomplished by court order. The task of dividing a secured debt into purchase money and nonpurchase money portions is not so burdensome that a court cannot apply its own formula in the absence of a contractual or statutory apportionment method.

■ We believe that one of the simplest and most direct methods of allocating payments to secured items is the first-in, first-out method. Under this method, the extent to which a security interest is purchase money is determined by applying payments to the price of items in the order in which those items were purchased. This is the method White and Summers recommend secured creditors use in multiple financing contracts,[20] and is also the method adopted in the Uniform Consumer Credit Code for consolidation of consumer credit sales.[21]

---

**14.** In a companion case, the *Coomer* court held that a loan consolidation under which no payments had been made did not affect a purchase money security interest because the total absence of payments mitigated the need for any determination of the extent of purchase money status. *In re Slay*, 8 B.R. 355 (Bkrtcy.E.D. Tenn.1980).

**15.** *In re Mulcahy*, supra note 2; *In re Brouse*, supra note 1; *contra, In re Norrell*, supra note 1.

**16.** *In re Staley*, supra note 1.

**17.** Supra note 13, at 355.

**18.** Supra note 1.

**19.** Id. at 475.

**20.** J. White & R. Summers, *Uniform Commercial Code* 802 (1972).

**21.** U.C.C.C. § 2–409.

Use of this method facilitates fairness and certainty of result to both the debtor and the secured creditor. It provides an easily applied rule of thumb—for purposes of purchase money status,[22] what is bought first is paid off first. Further, unlike the result that would obtain with some apportionment methods, most notably the one employed in *Brouse*,[23] the purchase money security interest will terminate some time before the balance on the refinanced loan is to be paid off. In this case, for instance, the collateral's purchase price would have been paid after seven payments were made on the secured note, though the terms of the second note provided for a total of 30 payments.

As it happens, however, the debtor has made four payments under the second loan. The payments were in the amount of $51 each, which when applied to the outstanding balance on the first note of $342.39 reduce that balance to $138.39. The unpaid price of the collateral that secured the first note is therefore $138.39, and the security interest in it remains purchase money to that extent.

We have discussed at some length the law relating to multiple financing arrangements without making any distinction between "add-on" or future advances contracts, which secure several items under a single, ongoing instrument, and refinance or consolidation loans, which involve two or more separate loan instruments. This case arises from a refinancing loan.

As in this case, a refinancing loan results in the cancellation of one note and replacement of it with another. The outstanding balance on the first note is, on paper at least, paid off with funds from the second note. At least one court, in *In re Jones*,[24] has held creditors strictly to the form of this type transaction. *Jones* held that terminating the initial loan also results in the termination of the purchase money security interest taken under it. Once terminated, the purchase money security interest cannot be revived. The refinancing is disqualified from treatment as a purchase money loan because it is made not to enable the creditor to acquire rights in the collateral, but is used instead to pay an antecedent debt.

The *Jones* result ignores, however, the substance of the refinancing transaction. Though in form the original note is cancelled, its balance is absorbed into the refinancing loan. To the extent of that balance, the purchase money security interest taken under the original note likewise survives, because what is owed on the original note is not eliminated, it is merely transferred to, and increased in amount by, another obligation. The refinancing changes the character of neither the balance due under the first loan nor the security interest taken under it.[25]

---

**22.** We hasten to note that we do not intend the apportionment method we have adopted here to apply across the board to any case other than one in which survival of a purchase money security interest through multiple financing is in issue. There may arise refinancing situations in which purchase money status is not in issue, in which case we will not feel compelled to apportion on a first-in, first-out basis.

**23.** The statute upon which the court in *Brouse* relied is almost identical to the contractual proration formula found unconscionable in *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C.Cir.1963).

**24.** Supra note 2; *accord, In re Slay*, supra note 14.

**25.** *Mid-Eastern Electronics, Inc. v. First Nat. Bank of So. Md.*, 455 F.2d 141 (4th Cir. 1970); *In re Rivet*, 299 F.Supp. 374 (D.C.Mich.1969); *Index Store Fixture Company v. Farmers' Trust Company*, 536 S.W.2d 902, 907 (Mo.Ct.App. 1976); *contra, Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.*, 3 UCC Reporting Service 1112 (R.I.Super.Ct.1966).

Although the *Coin-O-Matic* holding has been roundly criticized by almost all courts deciding the issue of whether a security interest automatically extends to future advances, one Kentucky court has expressed support for it. There is, however, a significant difference between the case sub judice and *ITT Industrial Credit Co. v. Union Bank and Trust Co.*, 615 S.W.2d 2 (Ky.Ct.App.1981). In *ITT Industrial Credit* the second loan was not a refinancing. About three weeks elapsed between the time the first loan was cancelled and the second loan was made. Proceeds of the second loan were not used to pay the first. The Kentucky Court of Appeals held that the perfected security in-

For that reason, the effect of refinancing on a security interest is not, as the court in *In re Mulcahy*[26] suggests, the same as if a debtor borrowed money from a third party to pay off a secured debt. *Mulcahy* reasoned that a creditor's security interest does not survive refinancing because the creditor merely "[transfers] money from its right pocket to its left".[27] We find the transfer from one pocket to another to be wholly permissible, so long as both pockets belong to the same creditor.

The debtors' motion for an order avoiding the lien of Associates Finance on a Zenith color television set is hereby denied. The lien retains its purchase money character to the extent of the unpaid purchase price, and that unpaid price we have determined to be $138.39. IT IS SO ORDERED.

---

terest taken under the first loan did not continue in the second.

**26.** Supra note 2.

**27.** Id. at 224.